CHIEF JUSTICE GRAY,
dissenting.
¶86 I respectfully dissent from the Court’s opinion, as I dissented from an order in an earlier phase of the underlying matter. It is my view that this case is now moot and that many of the procedural approaches by the Court in this cause and in Cause No. 00-034 have been totally lacking in legal authority. The result is that this Court has improperly intruded into issues involving conditions at the Montana State Prison (MSP) and reversed the District Court without determining that any of its extensive findings of fact are clearly erroneous or that its conclusions of law are incorrect. The Court also has placed that same District Court Judge in the position of undertaking further inspections and remediation regarding conditions of confinement at the MSP. I cannot agree.
¶87 Paragraphs 30 and 31 of the Court’s opinion do not fully capture the facts and procedural background regarding Walker’s petition to this Court in January of2000, in Cause No. 00-034, and in subsequent matters. We deemed the January of2000 document a petition for writ of mandamus and remanded to the Third Judicial District Court, Powell County, for the appointment of counsel to investigate the *124 factual basis for Walker’s complaint and, if warranted, to file a petition for appropriate relief in that court. The Third Judicial District Court expressed concern over the funding for the ordered counsel and investigation, and we subsequently ordered and received a response from the Department of Corrections (DOC). Among other things, the DOC argued that a writ of mandate was not appropriate because the petition did not meet the statutory requirements for such a writ. Having initially deemed Walker’s petition as one for a writ of mandamus, this Court thereafter simply ignored-and never addressed-the mandamus requirements.
¶88 Instead, the Court concluded that if Walker’s allegations were true, his constitutional rights to be free from cruel and unusual punishment might be implicated, but conceded that it was not authorized to collect the information and resolve the factual issues which might arise from the investigation. The Court then stated that persons imprisoned in Montana are not without “a remedy when or if their civil rights are violated.” I agree wholeheartedly with both of those statements in the Court’s order of March 9, 2000. Indeed, both this Court and Montana inmates are aware that the remedy for alleged violations of civil rights is 42 U.S.C. § 1983. With full knowledge of § 1983 actions, to protect civil rights, however, the Court did not state that to be the available remedy. It chose to conclude that our earlier decision in Ranta v. State, 1998 MT 95, 288 Mont. 391, 958 P.2d 670, provided the “way out” it was so desperately seeking for Walker to be able to proceed. The Court erred in this regard, and I dissented.
¶89 Ranta, ¶ 29, held that when an inmate seeks review of his or her sentence by this Court’s Sentence Review Division, that process is “a critical stage” of criminal proceedings for which a person is entitled to appointment of counsel where the possibility exists that a sentence will be increased. I agree entirely with the holding in Ranta. That holding, however, has absolutely no bearing on-or relevance to-inmate challenges to conditions of confinement once incarcerated, under the right to be free from cruel and unusual punishment, where § 1983 actions are the proper remedy. Such challenges, under either the law or common sense, simply are not seeking “review of a criminal sentence” in any form or fashion. Notwithstanding, the Court concluded, without any applicable legal authority whatsoever, that Walker’s challenge to the conditions of his confinement “is a critical stage related to the penalty phase of the criminal proceedings against him” (emphasis added) and, consequently, Walker was entitled to appointment of counsel. The potential consequences of that *125 conclusion-essentially, that appointed counsel is required whenever an inmate challenges conditions of confinement-cannot be calculated. Suffice it to say that costs for appointed counsel, now a state funded cost, will skyrocket and, almost without doubt, both district court case loads and this Court’s case load will do the same.
¶90 With regard to Walker’s January of2000 petition, then, the final portion of this Court’s order remanded to the Eighth Judicial District Court, Cascade County, in which Walker had been convicted and sentenced, for appointment of counsel to investigate the conditions of Walker’s imprisonment and, if warranted, to petition that court for the appropriate relief. As mentioned above, I dissented from that order.
¶91 On remand, counsel was appointed for Walker and began an investigation into Walker’s allegations. He eventually petitioned for postconviction relief on Walker’s behalf in the District Court. After receiving testimony and evidence regarding the petition on several occasions, the District Court entered its extensive Findings of Fact, Conclusions of Law and Order on February 14,2001, denying all relief requested by Walker. Walker then appealed to this Court in this Cause Number and the Court now issues its opinion, from which I dissent on a myriad of grounds.
¶92 First, I disagree with the Court’s conclusion in Issue 1 that Walker’s appeal is not moot even though he has been released from custody. Given his release, this Court cannot grant any effective relief to him. The inability to grant effective relief is, as the Court observes, our usual mootness test.
¶93 Moreover, I do not agree that either NGN. or N.B. is sufficiently similar to the present case as so to make those cases applicable here under the “capable of repetition, yet evading review” exception to the mootness test. In N.B., the mootness issue arose in the context of what . quantum of proof is required to involuntarily commit a person to a state mental hospital. The appellant argued that a Montana statute was unconstitutional pursuant to a United States Supreme Court opinion. We disagreed, held the statute constitutional and then, applying the statute to the appellant’s proceeding, concluded that the statutory requirements for involuntary commitment had not been met. That case did, indeed, involve a broad constitutional issue that was applied to the appellant’s case and, through it, to future cases. The reason it was necessary to do so under the exception to the mootness test was that a 90-day commitment made the timely resolution of an appeal from a commitment order “virtually impossible given our rules of appellate procedure.” N.B., 190 Mont. at 322-23, 620 P.2d at 1231. *126 K.G.F. also involved a 90-day involuntary commitment to a state mental hospital and we addressed the broad constitutional issue of whether the right to effective assistance of counsel applies in involuntary commitment proceedings, an issue not previously addressed by this Court.
¶94 The present case is readily distinguishable from both K.G.F. and N.B. Those cases involved precommitment issues on which our holdings had universal application to all involuntary commitment proceedings. They had nothing to do with conditions of confinement during an individual’s commitment and, therefore, were not limited to case-specific facts. Here, the Court states the “broad constitutional issue” on which it premises its determination that the case is not moot as whether BMPs constitute cruel and unusual punishment when such plans exacerbate an inmate’s mental health condition. This is not a determination that can readily be applied to a broad spectrum of cases. I recognize that the Court is attempting in good faith to analogize the very short-term BMPs in the present case to the 90-day commitments in K.G.F. and N.B., in an effort to ensure that, somehow, BMPs will not be used when they exacerbate an inmate’s mental health condition-so as to address in advance these situations which cannot be timely reviewed on appeal. The fact remains, however, that the crux of each case will be the issue of whether use of a BMP exacerbates the inmate’s condition. Thus, while the Court’s opinion may force the DOC to scrutinize using BMPs more carefully in certain cases, perhaps a laudable achievement, it cannot and will not preclude more cases incapable of timely review. Indeed, Walker’s petition was on his own behalf and the District Court ruled accordingly; the Court does not apply or address the actual facts of this case which, I note, do not include findings or conclusions that the BMPs “exacerbated” Walker’s mental health condition.
¶95 On appeal, Walker then stated the issue more broadly and, perhaps not surprisingly, the Court accepted this “invitation” to intrude into prison management to an extent I believe is untenable and insupportable. The Court did not stop there, however. It sua sponte broadened the issue even further (without so stating in the issue itself) in ¶ 84 by holding that both BMPs “and the living conditions on A-block” violate constitutional rights. In my view, Walker having sought relief from certain conditions he experienced while in the MSP, no effective relief can be granted by this Court now that he has been released, notwithstanding the Court’s holding in ¶ 45 that it is Walker’s appeal the Court is addressing. I submit that, in essence, *127 the Court is issuing an advisory opinion, which courts have no jurisdiction to do. See Northfield Ins. Co. v. Montana Ass’n of Counties, 2000 MT 256, ¶ 18, 301 Mont. 472, ¶ 18, 10 P.3d 813, ¶ 18 (citations omitted). Absent a showing in this case that either the BMPs or the conditions on A-block have exacerbated any inmate’s mental health condition, this case simply does not meet the “capable of repetition, yet evading review” test necessary to avoid mootness.
¶96 Mootness aside, the Court totally disregards the District Court’s 56 findings of fact, covering 18 pages, and its conclusions of law. While stating the proper standard of review regarding the clearly erroneous test for findings of fact and the “correct” standard for conclusions of law, the Court never addresses a single one of the District Court’s 56 findings, much less determines that any of them are clearly erroneous. Indeed, many of the so-called facts presented throughout the Court’s opinion are at odds with those found by the District Court. Nor does the Court address any errors it has discovered in the District Court’s conclusions of law which, of course, are premised on that court’s findings of facts. Finally, with regard to the Court’s reliance on the Montana constitutional right to individual dignity, Walker did not raise “dignity” or “humanity” in the District Court until filing his Proposed Findings of Fact and Conclusions of Law and even there, he did not cite to Article II, Section 4 of the Montana Constitution. For that reason, I disagree with the Court’s reliance on that particular constitutional right in its opinion.
¶97 More importantly, the Court’s vague and conclusory statements about this constitutional right do little to provide guidance in defining that right. Nor does the Court present the ordinary analysis of whether any violations of the right to dignity which might occur in prison settings can withstand our usual constitutional scrutiny. And while “some thoughts on the meaning and scope of the Montana Constitution’s dignity clause” by noted academics are of interest, they do not provide the needed analytical structure for addressing that right as it relates to the surely undisputed need of correctional officials to run prisons confining many violent and manipulative inmates.
¶98 The Court concludes broadly that “[o]ur Constitution forbids correctional practices which permit prisons in the name of behavior modification to disregard the innate dignity of human beings.” Such a conclusion fails to take into account or balance other constitutional rights which may be at issue in an appropriate case, such as those inalienable rights guaranteed by Article II, Section 3, held by other inmates, correctional staff and the Montana public. Virtually every *128 aspect of being incarcerated may, to some extent, degrade and demean persons. Certainly any member of this Court would find it so. But no legal authority is presented, and I daresay none can be found, which even begins to support the breadth of the Court’s conclusion. It is not enough to say that no other state has a comparable constitutional right and then just “take the ball and run with it.”
¶99 In this latter regard, the Court does not look to the source of the dignity right found in Article II, Section 4 of the Montana Constitution-namely, the verbatim transcript of the Montana Constitutional Convention. That transcript for March 7, 1972, where the Convention delegates unanimously adopted Section 4, captures the clear intent of the Convention with regard to the dignity right contained in Section 4-an intent totally at odds with the Court’s discussion of the right in this case:
DELEGATE MANSFIELD: The committee unanimously adopted this section with the intent of providing a constitutional impetus for the eradication of public and private discrimination based on race, color, sex, culture, social origin or condition, or political or religious ideas. The provision, quite similar to that of the Puerto Rico declaration of rights, is aimed at prohibiting private as well as public discrimination in civil and political rights. Considerable testimony was heard concerning the need to include sex in any equal protection or freedom from discrimination provisions. The committee felt that such inclusion was eminently proper and saw no reason for the state to wait for the adoption of the federal equal rights amendment or any amendment which would not explicitly provide as much protection as this provision. The word “culture” was incorporated specifically to cover groups whose cultural base is distinct from mainstream Montana, especially the American Indians. Social origin or condition was included to cover discriminations based on status of income and standard of living. Some fears were expressed that the wording “political or religious ideas” would permit persons who supported the right to work in principle to avoid union membership. Such is not the intent of the committee. The wording was incorporated to prohibit public and private concerns discriminating against persons because of their political or religious beliefs. The wording of this section was derived almost verbatim from the Delegate Proposal Number 61. The committee felt that this proposal incorporated all features of all the delegate proposals, numbers 10, 32, 50 and 51, on the subjects of equal *129 protection of the laws and the freedom from discrimination. The committee is well aware that any broad proposal on these subjects will require considerable statutory embellishment. It is hoped that the
Legislature will enact statutes to promote effective eradication of the discriminations prohibited in this section. The considerable support for and the lack of opposition to this provision indicates its import and advisability....
DELEGATE DAHOOD: ... There is no intent within this particular section to do anything other than to remove the apparent type of discrimination that all of us object to with respect to employment, to rental practices, to actual associationship in matters that are public or matters that tend to be somewhat quasi-public.....The intent of Section 4 is simply to provide that every individual in the State of Montana, as a citizen of this state, may pursue his inalienable rights without having any shadows cast upon his dignity through unwarranted discrimination....
Montana Constitutional Convention, Verbatim Transcript, Vol. V, March 7, 1972, pp. 1642-43 (emphasis added). It is my view that Delegates Mansfield and Dahood presented Section 4 as a package intended in its entirety to prohibit intrusion on a person’s dignity through discrimination, and the Convention accepted it as presented. Nothing in the transcripts supports a free-standing, separate dignity right.
¶100 As its last “act” in the present case, the Court puts the District Court in charge of such “inspections or further remediation as in that court’s discretion is necessary under the circumstances.” I suspect that, like myself, the District Court will have no idea what to do, when to do it, or how to respond to what may well be hundreds of petitions addressed to it requesting inspections into, investigations of, or challenges to conditions of confinement at any of Montana’s correctional facilities. Nor, I expect, will that court have a clue how it is to fund such matters.
¶101 I dissent strenuously from the Court’s opinion. I would affirm the District Court.